Anthony TRAPANI, Mary Hogan and Guy Ahearn, individually on their own behalf and on behalf of all persons similarly situated, Plaintiffs,

v.

CONSOLIDATED EDISON EMPLOYEES' MUTUAL AID SOCIETY, INC. and Paul R. Westerkamp, Defendants.

No. 85 Civ. 2690 (GLG).

United States District Court, S.D. New York.

Jan. 14, 1987.

Norman Rothfeld, New York City, for plaintiffs.

Bochner & Berg, New York City, for defendants; Stuart Bochner, of counsel.

GOETTEL, District Judge.

This is a class action brought on behalf of all persons employed in Staten Island by Consolidated Edison Company of New York, Inc. ("Con Ed") and represented by Local 3 of the International Brotherhood of Electrical Workers ("Local 3"). The defendants are Consolidated Edison Employees' Mutual Aid Society, Inc. ("Mutual Aid"), a membership corporation which provided health and welfare benefits to plaintiffs, and Paul R. Westerkamp, at all times pertinent here the chief administrative officer of Mutual Aid.

According to their complaint, plaintiffs became ineligible to receive benefits from Mutual Aid as of October 1, 1983, after plaintiffs had replaced Mutual Aid with a different vehicle for the provision of benefits. For this reason, plaintiffs claim that they are entitled to an aliquot share of the assets of Mutual Aid as of October 1, 1983, as well as to all of the assets of the "Staten Island Relief Fund," a special fund established by Mutual Aid for the purpose of providing emergency loans to Local 3 members. In their memorandum of law plaintiffs also claim that certain other monies received by Mutual Aid in 1964 should have been included in the Staten Island Relief Fund when it was established, and that they are, therefore, also entitled to the amount to which these monies would have grown had they been deposited in the fund at that time.

The complaint further alleges that by failing to account to plaintiffs for plaintiffs' share of Mutual Aid's assets, and for all of the monies of the Staten Island Relief Fund, defendants have defrauded plaintiffs of their accrued benefits. For this reason, plaintiffs claim that the defendants have violated their fiduciary duties in contravention of the Employment Retirement Income Security Act, 29 U.S.C. § 1101 *et seq.* (1974 & Supp.1985) ("ERISA").

Finally, plaintiffs allege that Mutual Aid is a trust fund, and that its constitution and by-laws constitute a trust instrument, with-

in the meaning of section 302(c)(5) of the Labor-Management Relations Act, 29 U.S.C. § 186(c)(5) (1978) (the "LMRA"). Because this "trust instrument" fails to provide for the transfer of an aliquot share of assets to a successor benefits vehicle, plaintiffs claim that contributions made on their behalf to Mutual Aid have not been used for their "sole and exclusive benefit." For this reason, plaintiffs claim that Mutual Aid has a "structural defect."

Based on these allegations, plaintiffs make several claims for relief. They seek a determination of their aliquot share of Mutual Aid's assets, and judgment therefor, with interest; the impressment of a lien upon Mutual Aid's assets; an adjudication that defendant Paul Westerkamp is personally liable for the amount of such lien; and the impressment of a trust upon the monies of the Staten Island Relief Fund, giving plaintiffs beneficiary title thereto, and an order directing defendants to convey legal title to plaintiffs. In addition, in their memorandum of law (although not in their complaint), plaintiffs seek the monies plus interest which they allege should have been included in the S.I. Relief Fund when it was established.

Plaintiffs move, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure for summary judgment on these claims. For the reasons stated below, the motion is denied.

*Background*

Until the summer of 1983, the membership of Mutual Aid was composed of employees of Con Ed and the Power Authority of the State of New York ("PASNY"), represented by Local 3 and by Local 1-2 of the Utility Workers Union of America ("Local 1-2").[1] The members of Local 3 had joined Mutual Aid in 1964 when Mutual Aid merged with the Staten Island-Mutual Aid Society ("SIMA").

Mutual Aid provided health and welfare benefits to its members pursuant to collective bargaining agreements between each local and Con Ed. In accordance with

---

1. The size of the membership is at issue.

these agreements, Mutual Aid received employee dues paid from payroll deductions made by Con Ed, as well as matching employer contributions made by Con Ed directly.

In addition to providing health and welfare benefits, Mutual Aid established several special relief funds. One of these, the Staten Island Relief Fund (the "S.I. Relief Fund"), was created in May 1982 for the purpose of providing emergency loans to Local 3 members. The source of the monies of this fund is at issue. Plaintiffs claim that these monies are derived from part of the $73,399 which Mutual Aid received from SIMA when they merged. Moreover, plaintiffs argue that all, and not merely part of the $73,399 turned over by SIMA should have been allocated to the S.I. Relief Fund.[2] Defendants, however, claim that the fund was financed by charitable contributions. and that the monies received from SIMA were absorbed into Mutual Aid unearmarked.

In June 1983, Locals 1–2 and 3 went on strike. Con Ed made no further remittances to Mutual Aid from that time except for certain amounts paid after July 31, 1984 pursuant to the Local 1–2 Settlement Agreement (described *infra*). The strike continued until August 19, 1983, when new collective bargaining agreements were executed with the two unions. Each of these new agreements replaced Mutual Aid with a different vehicle for the provision and administration of benefits. Nothing in Mutual Aid's constitution or by-laws specifically provided for a transfer of assets or reserves to successor benefits vehicles.

Con Ed's new agreement with Local 3 provided that Local 3 members' benefits would henceforth be provided and administered directly by Con Ed. The administration of the Staten Island Relief Fund, however, was unaffected by the new agreement; it continues to be managed by Mutual Aid.

According to Con Ed's agreement with Local 1–2, Mutual Aid was to be replaced with a trust controlled by an equal number of Con Ed and Local 1–2 representatives (the "Local 1–2 Trust"). Difficulties arose in subsequent negotiations, however, and the Local 1–2 Trust was not established until a second settlement agreement (the "Local 1–2 Settlement Agreement") was concluded July 31, 1984. This agreement provided, *inter alia*, that employee contributions held by Con Ed since July 16, 1983 (the date of the new collective bargaining agreements) would be placed in escrow; that to the extent Mutual Aid's assets were insufficient to cover benefit costs incurred through the date of the Settlement Agreement, Mutual Aid would be paid the deficit from the escrow; and that any balance remaining in the escrow would be paid to the Local 1–2 Trust.

According to the defendants, as a result of the foregoing, all of Mutual Aid's benefit assets and all of the escrow monies have

2. In May 1964, Mutual Aid opened a bank account with $30,665. The passbook for the account bore the notation "Staten Island Reserve." Plaintiffs make, *inter alia*, two allegations with respect to this account. First, they claim that the $30,665 with which it was created represented a part of the $73,399 which SIMA turned over to Mutual Aid upon their merger in April 1964. Second, they claim that the monies contained in this account were allocated to the S.I. Relief Fund, which was created in 1982.

Based on these allegations, plaintiffs argue that the full $73,399 turned over to Mutual Aid by SIMA should have been included in the Staten Island Reserve account, and thereafter allocated to the S.I. Relief Fund. Therefore, plaintiffs claim that in addition to the monies which in fact are in the S.I. Relief Fund, they are also entitled to that part of the $73,399 which was

not included in the Staten Island Reserve account, and therefore not allocated to the S.I. Relief Fund, plus interest.

Defendants deny that any monies of the S.I. Relief Fund were derived from SIMA assets, and claim that the S.I. Relief Fund was financed by charitable contributions. Notwithstanding this denial, Paul Westerkamp testified at his deposition that the board of directors approved a recommendation that the monies of the Staten Island Reserve account be used as a relief fund for "Staten Island plan members." Although, according to Westerkamp, "Staten Island plan members" include members of both Local 1–2 and Local 3, Westerkamp testified that in fact all of the sums disbursed were disbursed either to or for the benefit of members of Local 3 represented by the plaintiff class.

been exhausted, although the S.I. Relief Fund and at least one other special fund[3] continue to be available. Defendants claim that the "bulk" of the benefit assets were exhausted by the payment of "continued" benefits to Local 1–2 members, although a "portion" was also used to provide plaintiffs with "retroactive" benefits. Defendants do not explain by what date of demarcation they have deemed payments to be "retroactive" rather than "continued," nor exactly what "portion" of Mutual Aid's assets was used to provide plaintiffs with benefits, nor whether any part of Mutual Aid's assets allegedly attributable to plaintiffs was used to provide "continued" benefits to Local 1–2 members.

*Discussion*

This Court has jurisdiction to redress violations of ERISA, and to provide appropriate equitable relief to, *inter alia*, participants and beneficiaries of welfare benefit plans. 29 U.S.C. § 1132 (1974 & Supp. 1985). Mutual Aid is an employee welfare benefit plan within the meaning of ERISA. 29 U.S.C. § 1002(1) (1974 & Supp.1985).[4]

Except for certain instances not applicable here, an employee welfare benefit plan is subject to ERISA's requirements if it is established or maintained by either an employer engaged in commerce or in an industry or activity affecting commerce, or by an employee organization representing employees so engaged, or by both. 29 U.S.C. § 1003 (1974 & Supp.1985). Because Con Ed and its employees clearly fit within this description, Mutual Aid is subject to ERISA.

## I. *Mutual Aid Assets Excluding the S.I. Relief Fund*

Plaintiffs allege that the retention by Mutual Aid of the plaintiffs' aliquot share of benefit assets violates section 1103(c)(1) of ERISA, which requires that the assets of a plan "be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1) (1974 & Supp.1985) ("section 1103(c)(1)").

Section 302(c)(5) of the LMRA contains similar language. That section requires that monies paid by an employer to an employee representative be "for the sole and exclusive benefit of the employees of such employer, and their families and dependents...." 29 U.S.C. § 186(c)(5) (1978). The Second Circuit has interpreted this language in two recent cases, *Local 50, Bakery & Confect. Workers Union, AFL–CIO v. Local 3, Bakery & Confect. Workers Union, AFL–CIO*, 733 F.2d 229 (2d Cir. 1984) ("*Local 50*"), and *O'Hare v. General Marine Transport Corp.*, 740 F.2d 160 (2d Cir.1984) ("*O'Hare*").

The issues in *Local 50* arose when the employees of Entenmann's, Inc. voted to make Local 3, Bakery and Confectionary Workers Union, their new bargaining representative, thereby replacing Local 50 of

---

**3.** In addition to the S.I. Relief Fund, Mutual Aid established another special fund, the "Relief Fund." According to Paul Westerkamp, the "Relief Fund" was established from charitable contributions, and was created for the purpose of providing emergency relief to Local 1–2 members. Plaintiffs have made no claim for any part of the assets of the Relief Fund.

**4.** For purposes of ERISA, an employee welfare benefit plan is

"any plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both, ... for the purpose of providing for its participants or their beneficiaries, ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment...."

29 U.S.C. § 1002(1).

Mutual Aid was maintained by contributions from both an employer (Con Ed) and employees pursuant to collective bargaining agreements between them, for the purpose of providing "aid to its members in sickness and distress," Mutual Aid Constitution, Article II, effective April 15, 1954 as revised through December 21, 1978. Among other benefits, Mutual Aid provided its members with medical care, sick benefits, and life insurance.

Plaintiffs further allege, and defendants deny, that Mutual Aid is a trust fund. Neither plaintiffs nor defendants has offered any support for their contentions, and we do not decide this issue.

the same union. As a consequence of the new arrangement, Local 3's welfare benefits fund replaced that of Local 50 as provider of benefits to these employees. Among other things, the two welfare benefit funds disagreed over which was entitled to those monies held by the Local 50 fund, which represented past contributions made by Entenmann's on behalf of its employees.

The court ruled that the successor fund, Local 3's fund, was entitled to the monies. It found that if Local 50 did not transfer these funds to Local 3's fund, the monies "would have inured solely to the benefit of the remaining participants in the Local 50 fund, and Entenmann's workers would have derived no benefit from that portion of their past contributions." *Id.* at 231. For this reason, the court held that Local 50's retention of Entenmann's contributions violated § 302(c)(5) of the Labor Management Relations Act (the "LMRA"), which requires that payments made by an employer to the representative of its employees be "for the sole and exclusive benefit of the employees of such employer, and their families and dependents...." Id. at 234.

The court also pointed out that the equities of the situation supported its decision. First, it noted that employees should "reap the benefits of employer contributions made in lieu of wages," and that the remaining participants of Local 50's fund would be unjustly enriched were they to benefit from contributions made on behalf of Entenmann's employees. In addition, the court found that to permit a predecessor benefits fund to retain monies contributed for employees who chose a new union's fund would dissuade employees from changing unions. This circumstance "would not only impinge on free choice in representation, but would also permit unions without penalty to them to become less attentive to their constituencies' demands." *Local 50,* 733 F.2d at 233.

The *O'Hare* case presented circumstances somewhat similar to those in *Local 50,* yet sufficiently different that the *O'Hare* court found that in that case the predeces-

sor fund's retention of employer contributions did not violate section 302(c)(5) of the LMRA. In *O'Hare,* certain of the employer's employees changed their bargaining representative and thereby their pension fund. The employer sought to recover from the former pension fund those payments made on behalf of its employees who were no longer members of that fund. The employer argued that the "sole and exclusive benefit" language of section 302(c)(5) of the LMRA required that a departing group of employees be permitted to take with them an aliquot share of the predecessor pension fund.

The Court noted that the circumstances in *O'Hare* differed from *Local 50* in two significant respects. First, *O'Hare* involved the departure of only a small number, rather than all of the employer's employees who participated in the fund. Because of their small number, the departing employees did not "creat[e] a great distortion in the organization and financing of the [f]und." *O'Hare,* 740 F.2d at 173.

Second, *O'Hare* involved a pension fund rather than a welfare benefits fund. The importance of this distinction lies in the different approaches taken to the financing of pension funds and welfare benefit funds. To a greater extent than welfare benefit funds, the actuarial projections and vesting requirements of pension funds are premised on the assumption that certain members for whom contributions are made will in fact never receive benefits. *O'Hare,* 740 F.2d at 173.

For these reasons, the court held that the fact that a small number of employees leaves a large, multiemployer unit does not, without more, mean that pension funds must return money contributed on their behalf in order to comply with the mandate of section 302 that employers' contributions be "for the sole and exclusive benefit of the employees of such employer." *Id.*

Defendants suggest that the circumstances of the instant case more nearly approximate those of *O'Hare,* because plaintiffs allegedly constitute only an insubstantial part of Mutual Aid's member-

ship, and do not make up all of Con Ed's employees who participated in Mutual Aid. For these reasons, the defendants argue that we should find that the failure to transfer plaintiffs' aliquot share of Mutual Aid's assets does not mean that *none* of Con Ed's employees will benefit from its contributions, and that, therefore, it cannot be said that Con Ed's contributions were not held for the exclusive benefit of its employees.

Defendant's argument is not well taken, for several reasons. First, unlike *O'Hare*, *all* of Mutual Aid's members, both Local 1–2 and Local 3, left the fund on or near the same date.[5] This case is, therefore,

more "like *Local 50* ... where ... all of an employer's employees have left a fund en masse creating a great distortion in the organization and financing of the [f]und." *O'Hare*, 740 F.2d at 173.

Plaintiff's reliance on *O'Hare* is also misplaced because the instant case involves a welfare benefit fund rather than a pension fund. As explained above, this distinction is "worth noting," *O'Hare*, 740 F.2d at 174, n. 9; Local 3's members have a greater expectation of reaping the benefits of contributions made to a welfare benefit fund than to a pension fund.

We note also that the equities of this case more heavily favor the plaintiffs than

---

5. Plaintiffs do not clearly state their position as to whether their membership in Mutual Aid has been terminated. On the one hand, they vociferously deny defendants' allegations that plaintiffs have "opted out" or "resigned" from Mutual Aid. On the other hand, plaintiffs acknowledge that they have become "ineligible" for benefits from Mutual Aid as of October 1, 1983, and that this "ineligibility" was a product of their collective bargaining agreement with Con Ed.

These somewhat contradictory positions show nothing more than semantic maneuvering. The gravamen of plaintiffs' complaint is that they have chosen a successor vehicle for the provision of benefits, and that defendants have not released to that vehicle monies allegedly attributable to them. Plaintiffs suggest no reason how, if they have chosen a successor vehicle, they have simultaneously remained members of Mutual Aid, nor why, if they have remained members of Mutual Aid, defendants are obligated to release any monies for their benefit.

Defendants clearly state their position that plaintiffs' membership has been terminated, but do not clearly establish the date of termination. Defendant Paul Westerkamp, who is the chief administrative officer of Mutual Aid, interprets Mutual Aid's constitution and by-laws to mean that the plaintiffs' membership in Mutual Aid ceased in June 1983, because upon the inception of the strike Con Ed ceased making remittances to Mutual Aid.

However, according to the defendants' memorandum of law, the plaintiffs' membership ceased on August 19, 1983, when plaintiffs executed their new bargaining agreement, because "the effect of the 1983 Agreements were [sic] that Plaintiffs ceased to have contributions made on their behalf ... and as a result benefits no longer flowed."

Each of the defendants' methods of calculation produces a date of termination for Local 3's membership in Mutual Aid within one year of the latest date on which Local 1–2's membership could have ceased.

For example, if Paul Westerkamp's analysis is correct, then both Local 3 and Local 1–2 lost their membership in Mutual Aid at the same time. This is because Con Ed withheld remittances for both locals, so that if plaintiffs' membership ended in June 1983 as a result of Con Ed's failure to make remittances, then presumably Local 1–2 lost its membership at the same time, for the same reason.

The same result is obtained by following the analysis outlined in the defendants' memorandum; the plaintiffs lost their membership in Mutual Aid because the effect of their collective bargaining agreement was that contributions were no longer to be made to Mutual Aid, but to another vehicle. The object, if not the effect, of Local 1–2's collective bargaining agreement was the same; contributions were no longer to be made to Mutual Aid, but to a trust which would replace Mutual Aid. Both locals executed their collective bargaining agreements on the same date. Therefore, defendants' memorandum's analysis also leads to the conclusion that both locals terminated their membership in Mutual Aid on the same date.

If we look to the Settlement Agreement, rather than Local 1–2's collective bargaining agreement, as the salient agreement by which contributions would no longer be made on Local 1–2's behalf, then defendants' memorandum's analysis leads to the conclusion that Local 1–2's membership was terminated less than a year after Local 3's termination.

There is at least one other date which could arguably constitute the date of plaintiffs' termination, which is August 22, 1983. According to Article 7.1 of Local 3's collective bargaining agreement, as of that date Con Ed was to have established a "Comprehensive Medical Plan" to replace Mutual Aid. This date also is within one year of the date of the Settlement Agreement, the latest date as of which Local 1–2's membership could have been terminated.

was the case in either *Local 50* or *O'Hare*. Those cases involved only the recoupment of funds contributed by the employer. In this case, plaintiffs are seeking the return not only of employer contributions, but of their own payroll deductions as well.

■ For these reasons, we find that section 1103(c)(1) of ERISA proscribes Mutual Aid's retention, for the benefit of Local 1–2, of benefit assets attributable to Local 3.

■ This finding does not, however, enable us to grant summary judgment, because several issues remain which concern whether Mutual Aid did in fact retain such assets in violation of section 1103(c)(1), and, if so, how much.[6] Fed.R.Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 9–10 (2d Cir.1986). These remaining issues include: the date on which plaintiffs' membership in Mutual Aid ceased; the amount of Mutual Aid's benefit assets on that date; the size of the total membership and of plaintiff class on that date; and whether any benefits were paid to plaintiffs after that date, and, if so, how much.

## II. Assets of the Staten Island Relief Fund

■ Defendants state, and plaintiffs do not deny, that the S.I. Relief Fund continues to be administered by Mutual Aid in the same manner as before the 1983 agreements. Plaintiffs' complaint is that the continued management by Mutual Aid of a fund which is intended for their benefit is an effrontery, since they are no longer members of Mutual Aid. Other than their indignation, however, plaintiffs offer no

reason why the present arrangement should be disturbed.

Because we cannot find that plaintiffs are entitled to the assets of this fund as a matter of law, plaintiffs are not entitled to summary judgment on this claim. *Id.*

## III. Monies received by Mutual Aid From the Merger with SIMA

In their memorandum of law, plaintiffs claim that all of the monies which Mutual Aid received from SIMA upon their merger should have been allocated to the S.I. Relief Fund.[7] Defendants attack this claim on both procedural and substantive grounds.[8]

We need not address defendants' defenses, because plaintiffs have not shown that they are entitled to a judgment for these monies as a matter of law. *Id.*

■ Plaintiffs' sole support for their claim appears to be their allegation that the monies which in fact are in the S.I. Relief Fund are derived from SIMA assets. Even were this allegation true (which we do not decide), it is not instructive; it does not disclose the reasons for which Mutual Aid allocated SIMA assets as alleged. Plaintiffs, therefore, have not suggested why any part, much less all of SIMA's assets should have been allocated to the S.I. Relief Fund.

SO ORDERED.

**6.** In their amended complaint, plaintiffs request the Court to place a lien upon the assets of Mutual Aid and to adjudge Paul Westerkamp personally responsible for the amount of such lien. Because it is not clear whether defendants have violated ERISA, nor whether Mutual Aid has any assets to which a lien could be attached, summary judgment for these claims is also denied.

**7.** See footnote 2.

**8.** Defendants argue that this claim is not properly raised, because it does not appear in either

the complaint or the amended complaint. In addition, they argue that because the claim is based on actions taken in 1964, it is barred by an (unspecified) statute of limitations.

Plaintiffs do not address defendants' argument that the claim is not properly raised. They do, however, contest defendants' defense of a statute of limitations. Plaintiffs argue (without support) that no statute of limitations bars their claim, because it did not accrue until August 18, 1983, when, according to *defendants*, plaintiffs ceased to be members of Mutual Aid.