**Anthony TRAPANI, Mary Hogan and Guy Ahearn, individually on their own behalf and on behalf of all persons similarly situated, Plaintiffs,**

v.

**CONSOLIDATED EDISON EMPLOYEES' MUTUAL AID SOCIETY, INC., and Paul R. Westerkamp, Defendants.**

No. 85 Civ. 2690 (JAR).

United States District Court,
S.D. New York.

Aug. 16, 1988.

national Brotherhood of Electrical Workers (Local 3), seeking an aliquot share of the assets of Mutual Aid as well as all of the assets of a special emergency loan fund—Staten Island Relief Fund—established and administered by Mutual Aid for the benefit of Local 3 members.

## Background

The background to this action is set forth in greater detail in an earlier decision by Judge Geottel on this matter. *Anthony Trapani v. Consolidated Edison Employees' Mutual Aid Society, Inc.,* 651 F.Supp. 400, 401–03 (SDNY Jan. 14, 1987). Briefly, they are as follows. Prior to the summer of 1983, membership in Mutual Aid included certain Con Ed employees represented by two unions, Local 3, as well as Local 1–2 of the Utility Workers Union of America (Local 1–2).[1] Mutual Aid received employee dues and matching employer contributions and provided health and welfare benefits pursuant to each local's collective bargaining agreements with Con Ed. After a strike in the summer of 1983, Local 1–2 and Local 3 each emerged with new agreements providing, *inter alia,* for new health and welfare vehicles that replaced Mutual Aid. The administration of benefits for Local 3 was taken over by Con Ed directly. Control over Local 1–2's benefits was eventually transferred to a trust jointly controlled by Local 1–2 and Con Ed (the Trust Fund).

As a result of these changes several disputes arose regarding the finances of Mutual Aid. Differences among Local 1–2, Con Ed and Mutual Aid were resolved through a settlement agreement to which Local 3 was not a party. Defendants' Exhibit B. Plaintiffs' claim for an equitable distribution of the assets of Mutual Aid, made in September, 1983, was not resolved, and is the basis for the present action.

In ruling on plaintiffs' motion for summary judgment, Judge Geottel found that Mutual Aid is an employee welfare benefit plan subject to ERISA requirements, and

Norman Rothfeld, New York City, for plaintiffs.

Stuart Bochner, Bochner & Berg, New York City, for defendants.

## MEMORANDUM OPINION

RESTANI, Judge, Sitting by Designation:

This case involves claims under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* (1982 & Supp. IV 1986) against a membership corporation, Consolidated Edison Employees' Mutual Aid Society, Inc. (Mutual Aid), and its administrative officer, Paul R. Westerkamp. Plaintiffs bring this action on behalf of Consolidated Edison (Con Ed) employees represented by Local 3 of the Inter-

1. Mutual Aid also included certain management level employees who were limited members.

that ERISA proscribes its "retention, for the benefit of Local 1–2, of benefit assets attributable to Local 3."[2]  651 F.Supp. at 406.  (citing 29 U.S.C. § 1103(c)(1), applying *Local 50, Bakery & Confect. Workers Union, AFL–CIO v. Local 3, Bakery & Confect. Workers Union, AFL–CIO,* 733 F.2d 229 (2d Cir.1984) and distinguishing *O'Hare v. General Marine Transport Corp.,* 740 F.2d 160 (2d Cir.1984), *cert. denied,* 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985)).  The court did not grant summary judgment to plaintiffs, however, finding that:

> several issues remain which concern whether Mutual Aid did in fact retain such assets in violation of section 1103(c)(1), and, if so, how much. These remaining issues include: the date on which plaintiffs' membership in Mutual Aid ceased; the amount of Mutual Aid's benefit assets on that date; the size of the total membership and of plaintiff class on that date; and whether any benefits were paid to plaintiffs after that date, and if so, how much.

651 F.Supp. at 406 (footnote and citations omitted).

In addition, the court refused to grant summary judgment to plaintiff with respect to the Staten Island Relief Fund, noting that:

> Defendant's state, and plaintiffs do not deny, that the S.I. Relief Fund continues to be administered by Mutual Aid in the same manner as before the 1983 agreements.  Plaintiffs' complaint is that the continued management by Mutual Aid of a fund which is intended for their benefit is an effrontery, since they are no longer members of Mutual Aid.  Other than their indignation, however, plaintiffs offer no reason why their present arrangement should be disturbed.

651 F.Supp. at 406.

### Discussion

█ A trial was held to determine the issues left open in the court's earlier decision.  As to the date on which plaintiffs' membership in Mutual Aid ceased, plaintiffs argue that they never ceased to be members because they did not receive notice of non-payment of dues.  Plaintiffs provided no evidence which convinces the court that notice, or lack thereof, of failure to pay dues has any relevance to this case.  *See* 651 F.Supp. at 405 n. 5.  Plaintiffs ceased to make contributions to the benefits plan in the summer of 1983.[3]  On September 1, 1983 plaintiffs' attorney wrote a letter stating that plaintiffs had ceased being members because of a new union contract.  The contract itself provided for a new benefits plan and states that benefits will be provided from the day of return to work.  Plaintiffs' first witness, James McCarner, stated that the strike ended "around Labor Day."  Certainly plaintiffs' membership must be considered to have ceased sometime in early fall 1983 at the latest.

█ In determining plaintiffs' aliquot share of the Mutual Aid general funds, the court must determine the size of total membership in Mutual Aid, and of plaintiffs' class.  It is undisputed that at the time of plaintiffs' cessation of membership there were 575 Local 3 members of Mutual Aid.  In addition, the parties agree that there were between 15,000 and 15,025 Local 1–2 members,[4] and 4,500 management employees.  The only issue of contention between the parties as to this issue is whether these management employees, who were limited members of Mutual Aid

---

2. This finding concerned the plaintiffs' claims to the assets of Mutual Aid other than the Staten Island Relief Fund.

3. Defendant, Mr. Paul Westerkamp, testified that in June of 1983, when a strike by Local 3 began, defendants stopped providing benefits to Local 3 members, and that he considered their membership in Mutual Aid to have ceased, due to the fact that membership dues were no long-

er being provided to Mutual Aid.  Transcript at 5, 19–21 & 26.

4. Defendant indicates the number of Local 1–2 members was 15,000, while plaintiffs indicate that it was 15,025.  As defendant agrees to a number which favors plaintiffs in a minor way, the court adopts defendant's number.

should be included in the calculation of the size of total membership. Plaintiffs argue that management members should be entirely excluded, thereby increasing plaintiffs' proportional rights to the assets of Mutual Aid, while defendant argues the opposite—that management members should be entirely included, thereby decreasing plaintiffs' proportional rights. Under the facts of this case, neither position seems entirely reasonable.

Management members accounted for 22 percent of the total number of all members in Mutual Aid (4,500/20,100). Due at least in part to limited benefits rights, however, management members tended to contribute only about 8 percent of total member dues as well as to receive about 8 percent of total expenditures paid on behalf of all members.[5] Plaintiffs' Exhibit 2. Working only with the actual number of management members, without also taking into account the differing degree management members financial participation, could result in an arbitrary allocation of assets in this case. If management members are to be excluded from the determination of the total membership in Mutual Aid, as plaintiff urges, then assets attributable to the participation of those same management members should similarly be excluded from the determination of the total assets available. Thus, for purposes of determining plaintiffs' aliquot share of assets attributable to regular members, the court finds that plaintiffs constituted 3.69 percent of all regular members of Mutual Aid (575/15,575). An appropriate adjustment of assets is discussed *infra.*

Next, the court must determine the amount of assets available as of the date of plaintiffs' cessation of membership, and attributable to all regular members. Three financial statements were introduced at trial: Main Hurdman's audited year end 1982,

and year end 1983 statements, and the controller's June 30, 1983 statement. The last statement before membership ceased was the June 30, 1983 controller's statement. Plaintiffs' Exhibit 16. That statement was made within a few months of termination. Although it was unaudited it was not seriously challenged. It was also consistent with the other two audited statements which showed a general increasing trend in assets. The controller's statement shows a balance in the general fund of $3,381,-004.91 at the end of June, 1983. That balance represents funds remaining after contributions and expenditures, by and on behalf of, regular and limited members.[6] Accordingly, it should be reduced by 8 percent, to factor out the economic participation of limited members. *See* discussion *supra.* The resulting balance of $3,110,-524.52 ($3,381,004.91 reduced by 8%) represents the balance attributable to all regular members.

■ The final issue which the court set forth for resolution was whether benefits were paid to plaintiffs after they ceased to be members of Mutual Aid. Defendants did not address in their post trial brief whether doctor bills stemming from the period before plaintiffs ceased to be members were paid on behalf of plaintiffs after August 1983. Theoretically, this could reduce the recovery. If any record would show how much was paid on account of the past independent services for Local 3 members, such records were not produced, and defendant Westerkamp indicated no such records were maintained. It has been established, however, that most of the depletion of assets after August, 1983 was on account of Local 1–2 employees as they received continuing benefits until August, 1984, and contributions were not made to the pool during the August 1983–1984 time

---

5. The numbers presented in the audited financial statements for 1982 and 1983 indicate that for both years, limited member contributed 8% of total member dues, and received 8% of total expenditures. Plaintiffs' Exhibit 2. The unaudited statement for June 30, 1983 indicates that limited member contributions ran about 9% and expenditures were up to 12%. Plaintiffs' Exhibit 16.

6. The parties have agreed that the controller's figure for the June 30, 1983 balance in the general fund corresponds to the net assets available for benefits figures listed in the audited year end statements at Plaintiffs' Exhibit 2. Transcript at 12.

period. Of course, Local 1–2 members also caused the accrual of bills for independent services prior to August 1983. As there were various forms of benefits plus continuing benefits for Local 1–2 members, payments for past independent services on account of Local 3 members likely would not offset much of plaintiffs share. As it was defendants who failed to keep records of the payments on a segregated basis, plaintiffs should not suffer prejudice on this issue. In addition, as the fund increased in the latter half of 1983, it may have contained somewhat more assets when membership ceased in early fall 1983 than it did on June 30, 1983, the day of the financial statement utilized by the court in fixing damages. Thus, it appears not inequitable to make no deduction for these relatively small payments of unknown amount.

From the above findings, it is evident that at the time that plaintiffs' ceased to be members in Mutual Aid, defendants retained benefit assets attributable to Local 3 in the amount of $114,778.35 (3.69% times $3,110,524.52). As will be shown below, these assets were retained for the benefit of Local 1–2, not Local 3.

After the strike by Local 3 began, defendants stopped providing further benefits to Local 3 members. Defendants did not set aside any funds based upon any claim plaintiffs may have to a portion of the general assets of Mutual Aid. Transcript at 134. During the period from August, 1983, to August 1, 1984, Mutual Aid continued providing benefits to Local 1–2 members, but not Local 3 members. Transcript at 110–111. During this same peri-

od, Con Ed withheld employee and employer contributions from Mutual Aid. Plaintiffs' Exhibit 2, at 8.

■ Although Con Ed eventually released withheld funds, Mutual Aid was not repaid for the entire amount of assets used in providing benefits to Local 1–2 members.[7] Accordingly, the court finds that the benefit assets attributable to plaintiffs were retained by defendants for the benefit of Local 1–2 members. Pursuant to Judge Goettel's ruling, such action is proscribed by ERISA.

### Fiduciary's Individual Liability

Plaintiffs urge the court to also find Paul R. Westerkamp liable in his individual capacity for mismanagement of Mutual Aid. Specifically, plaintiffs argue that Mr. Westerkamp's mismanagement included the failure to set aside a reserve in 1983 upon receipt of plaintiffs' claim letters and notice of plaintiffs' first lawsuit; the failure to inform Main Hurdman, the accounting firm for Mutual Aid, of the existence of plaintiffs' claims against Mutual Aid; and the participation in a settlement agreement resulting in the loss of contributions, depletion of assets of Mutual Aid, and replacement of Mutual Aid with Local 1–2's new Trust Fund.

■ Under ERISA, a fiduciary can be found personally liable for a plan's losses that result from a breach of fiduciary duties. 29 U.S.C. § 1109 (1982). Mr. Westerkamp's capacity as Secretary and Chief Administrative Officer of Mutual Aid and

---

7. On July 31, 1984, Mutual Aid, Con Ed and Local 1–2 signed a settlement agreement which provided for the payment of accrued member contributions of some 6 million dollars, plus interest, into an escrow fund. Defendants' Exhibit B, at 5–7. *See* Defendants' Exhibit C (escrow agreement). This settlement agreement further provided that the escrow fund would be used to pay off "an amount equal to the excess of the 'Unpaid Benefit Costs' over the 'Available Assets,'" with the balance of the escrow fund to be turned over to a newly formed benefits vehicle for Local 1–2, the Mutual Aid Society Fund (Trust Fund). Defendants' Exhibit B at 7–8. Mutual Aid gave up its right to receive this balance of withheld employee contributions, the entire amount of withheld employer contribu-

tions, and various other interests. E.g. Defendants' Exhibit B at 9.

On August 1, 1984, Mutual Aid ceased paying its personnel, including Mr. Westerkamp, and ceased providing benefits to anyone. Transcript at 4–7, 47, 67 & 101. On that same day, Mr. Westerkamp assumed the position of chief administrative officer of the Local 1–2's new Trust Fund. Transcript at 7 & 69–70.

In June, 1984, 5½ million out of a 6½ million dollar escrow fund was paid out to the new Trust Fund, in accordance with a July 31, 1984, escrow agreement. Plaintiffs' Exhibit 6. As of the time of trial, defendant testified that Mutual Aid has no money left in its general funds to pay its bills. Transcript at 72.

his conduct in such capacity, brought him within ERISA's definition of a fiduciary. 29 U.S.C. § 1002(21)(A) (1982).

As the Supreme Court has stated:

The manner in which trustee powers may be exercised, however, is further defined in the statute through the provision of strict standards of trustee conduct, also derived from the common law of trusts—most prominently, a standard of loyalty and a standard of care. Under the former, a plan fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of providing benefits to participants and their beneficiaries; and ... defraying reasonable expenses of the plan." 29 U.S.C. § 1104a(1)(A). See also § 1103(c)(1); cf. § 186(c)(5). Under the latter, a fiduciary "shall discharge his duties with respect to a plan ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." § 1104(a)(1)(B).

.... ERISA Clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled.

*Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 570–71, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985) (footnote omitted).

Defendants argue that the standards set forth at 29 U.S.C. § 1104(a)(1) (1982) differ from the requirements of 29 U.S.C. § 1103(c)(1) (1982) discussed in the earlier opinion in this case. The portion of section 1103(c)(1) relied upon by Judge Goettel in his opinion provides that the assets of a plan "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). To that extent, the requirements of section 1103(c)(1) correspond directly to the scope of a fiduciary's duty under section 1104.

In fact, section 1104 expressly provides that the scope of a fiduciary's duties are subject to the same limitations as are provided for under section 1103(c). The question remains, however, as to what standard the court will apply in reviewing a fiduciary's conduct.

Defendants argue that the court must apply an arbitrary and capricious standard, rather than the prudent man standard specifically set forth in the statute. Both standards of care have been applied by courts in various cases. One case, *Struble v. N.J. Brewery Employees' Welfare Trust Fund,* 732 F.2d 325 (3rd Cir.1984) discussed the basis for selecting which standard to apply in a given case. According to *Struble* "Although the courts have described the applicability of the arbitrary and capricious standard in rather overbroad language, they nonetheless have limited the use of the standard to cases involving personal claims for benefits. In other cases they have consistently applied the standards set forth explicitly in ERISA." 732 F.2d at 333. *Compare* Note, Judicial Review of Fiduciary Claim Denials Under ERISA: An Alternative to the Arbitrary and Capricious Test, 71 Cornell L.Rev. 986 (1986) *with* Note, Fiduciary Standards and the Prudent Man Rule Under the Employment Retirement Income Security Act of 1974, 88 Harv.L.Rev. 960 (1975). The *Struble* court explained the distinction as follows:

The use of different fiduciary standards in these cases is justified by the different challenge to fiduciary loyalty that each type of action presents. In actions by individual claimants challenging the trustees' denial of benefits, the issue is not whether the trustees have sacrificed the interests of the beneficiaries as a class in favor of some third party's interests, but whether the trustees have correctly balanced the interests of present claimants against the interests of future claimants.... In the later type of action the gravamen of plaintiff's complaint is not that the trustees have incorrectly balanced valid interests, but rather that they have sacrificed valid in-

terests to advance the interests of non-beneficiaries.

732 F.2d at 334. Although cases in this circuit have not discussed the basis for using one standard over another, their selection of standards appears to be consistent with the distinction set forth in *Struble*. Compare e.g. *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.1982), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) (cited in *Struble* and applying a prudent man standard to fiduciaries' failure to resign after conflicts of interest arose) *and Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.), *cert. denied* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) (applying a prudent man standard to fiduciaries' failure to seek outside assistance in evaluating the soundness of a proposed loan) *with Schwartz v. Newsweek, Inc.*, 827 F.2d 879, 881 (2d Cir.1987) ("In actions challenging the denial of benefits under an ERISA plan, review is limited to determining whether the administrator's decision was arbitrary and capricious.") and cases cited therein.

■ In this case, plaintiffs' claims extend to conduct beyond the mere balancing of interests among claimants through the payment or non-payment of certain claims. Plaintiffs' claims reach defendant Westerkamp's responsibilities regarding the management of the general assets of Mutual Aid and collection of monies owed to it. By agreeing to let most of the employee, and all of the employer, contributions withheld from Mutual Aid by Con Ed be turned over to a new entity—the Trust Fund—without making some arrangement for the claims of plaintiffs, Mr. Westerkamp sacrificed the interests of Local 3 members, who were not covered by the new Trust Fund.[8] In addition, this resulted in advancing the interests of non-beneficiaries: the Trust Fund, administered by Mr. Westerkamp, and its beneficiaries, and arguably Con Ed, which was able to finance its new obligations to the Trust Fund with the past employee and employer contributions it

withheld from Mutual Aid. Accordingly, the court finds that the ERISA's prudent man standard, rather than an arbitrary and capricious standard, is appropriate in this case.

■ In determining whether Westerkamp breached his fiduciary duty, the court finds, as a preliminary matters, that he had ample notice of plaintiffs' claim to a portion of the general assets of Mutual Aid. Plaintiffs sent three letters to Mr. Westerkamp in September of 1983 setting forth their essential claim: since plaintiffs ceased to be members of Mutual Aid, a *"de facto* partition" was created, requiring an equitable distribution and transfer of the assets of Mutual Aid. Plaintiffs' Exhibits 12, 13, & 14. Although Mr. Westerkamp could not recall whether he had, or had not, received these letters, Transcript at 14, defendants' counsel made no objection to the authenticity or relevance of those letters, but rather stipulated to their receipt into evidence. Transcript at 3. In addition, plaintiffs' followed through with their letters by commencing several lawsuits.

Next, plaintiffs established that, after receiving notice of plaintiffs' claims, defendant undertook the course of conduct discussed above. Specifically, defendant did not set up a reserve fund to provide for plaintiffs' claims. Defendant continued to provide benefits to Local 1–2 members, but not Local 3 members, at a time when Mutual Aid was not receiving contributions on behalf of either Local 1–2 or Local 3 members. Defendant provided those benefits to Local 1–2 members with use of assets of Mutual Aid, which were attributable to past contributions by and on behalf of both Local 1–2 and Local 3 members. As a result, these assets were depleted. Defendant released Con Ed from any obligation to replenish these assets with withheld contributions and other monies, and agreed to the transfer of those contributions to a new entity which owed no duty to plaintiffs.

---

**8.** Although the money withheld by Con Ed concerned contributions by and on behalf of Local 1–2 members, Mutual Aid and Local 3 had an interest in having the entire withholdings

turned over to Mutual Aid, since its general reserves were depleted in paying claims of Local 1–2 during the period that contributions were withheld.

Based upon all of the circumstances discussed so far, the court finds that plaintiffs have provided ample evidence to warrant a finding of a breach of fiduciary duty. Had defendant put on evidence which placed its conduct in a setting which provided some explanation or justification, the court might be in a position to consider whether its conduct was prudent or reasonable under those particular circumstances.

Defendant did not, however, put on evidence establishing any efforts on his part to actually evaluate or respond to plaintiffs' claim for an aliquot share of the general assets of Mutual Aid. Defendant's testimony on this issue was limited to statements of a hypothetical nature. For instance, in response to an inquiry regarding plaintiffs' claim letters, defendant responded "if I did receive them, I would have referred them to the Society's attorney." *Id.* at 14. Similarly, although defendant could not recall whether he had advised Mutual Aid's accounting firm, Main Hurdman, that a lawsuit had been commenced by plaintiffs' seeking an aliquot share of benefits, he testified that the Society's attorney would have so advised the accounting firm. *Id.* at 9 & 134. The 1983 financial statement audited by Mutual Aid's accounting firm made no mention of any claims by Local 3 for a share of the general benefit funds of Mutual Aid. Plaintiffs' Exhibit 2.[9]

Even if one accepts Mr. Westerkamp's testimony as evidence that he did, in fact, refer plaintiffs' claim letters to the attorney for Mutual Aid, prudence requires a level of diligence and care beyond merely forwarding claims to one's attorney. A fiduciary who is ill-equipped to evaluate a claim may have a duty to seek outside assistance. *See Katsaros v. Cody,* 744 F.2d at 279–80. Beyond that, even good faith reliance upon the advice of counsel may not altogether relieve a fiduciary of his duty to act prudently and make an independent evaluation. *See Davidson v. Cook,* 567 F.Supp. 225, 239–40 (E.D.Va. 1983), *aff'd* 734 F.2d 10 (4th Cir.1984). In this case, defendant presented no evidence to indicate whether he followed through and sought, or received, advice from counsel, whether he acted upon such advice, and whether he made an independent evaluation of such advice.[10]

Under the circumstances of this case, the court finds that defendant failed to discharge his duties for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence required under the circumstances.[11]

In light of the above, the court also finds that plaintiffs have made a sufficient showing to warrant a decision on their claim regarding the Staten Island Reserve Fund.[12] Continued administration of this

9. *Notes to the statement did indicate, however,* that members of Local 3 ceased participation in the Mutual Aid, and that it was a defendant in a lawsuit regarding net assets of the Staten Island Relief Fund. The notes also stated that as part *of a settlement between Con Ed, Mutual Aid and* Local 1[–2], "a trust fund was established and net assets of the Society were transferred to the fund." Plaintiff's Exhibit 2.

10. Had any such action taken place, it seems that defendant, who would have had control over any relevant records reflecting such action, would have produced them and would have testified as to his action.

11. Were an arbitrary and capricious standard applicable in this particular case, the court finds that defendant's conduct would still rise to the level of a breach of fiduciary duties. As defendant has argued to the court

Plaintiffs have produced no evidence of any violation of fiduciary standards of care (re-

gardless of which standard is applied). In its review of fiduciary actions, the standard to be applied by the Courts is whether the individual defendant acted based upon a rational basis. In so examining the individual fiduciary actions, the Court should concern itself with such factors as whether the fiduciary acted independently or on the instruction of non-fiduciaries, *whether[ ] the merits of the action were investigated and whether professional advice was sought.*

Defendant's Memorandum of Law [In Response to the Court's Request of February 25, 1988] at 10 (emphasis added and citations omitted).

12. Defendants argue that the Staten Island Relief Fund is available to Con Ed employees who reside in Staten Island, as well as to Local 3 members (employees who work for Con Ed's Staten Island facilities). Defendants produced no evidence at trial in support of their position. On the other hand, plaintiffs have produced no

fund by defendants at this point presents plaintiffs' with something more than a mere effrontery. In addition, the fact that the Mutual Aid is unable to pay for its own administration, let alone for that of the Staten Island Reserve Fund, provides little assurance that the Staten Island Reserve Fund will be properly administered in the future. Finally, the history of greater loan use by officers and committee members, as compared to ordinary members, lends support to alternative plans for equitable distribution or new administration of the Staten Island Relief Fund. Mr. Westerkamp may not remain an administrator of that Fund.

The parties shall consult and submit proposals for appropriate methods of implementing this opinion within two weeks. Thereafter, the court will schedule a conference with the parties to discuss the judgment and its implementation.

evidence at trial to establish their claim that defendants deprived the Staten Island Relief Fund of any specific assets. *See* 651 F.Supp. at 406.